**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
MARIE PLACIDE-EUGENE,

               Plaintiff,

         -against-

VISITING NURSE SERVICE OF NEW YORK,
and ELOISE GOLDBERG, JILL
MENDELSON, and MARIAN HAAS,

               Defendants.
----------------------------------------------------------X

**FILED**
**CLERK**

5/30/2013 3:37 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-2785 (ADS) (ARL)

<u>**APPEARANCES:**</u>

**White Ricotta & Marks, P.C.**
*Attorneys for the Plaintiff*
86-12 37th Avenue
Jackson Heights, NY 11372
    By:   Thomas Ricotta, Esq., Of Counsel

**Collazo Florentino & Keil LLP**
*Attorneys for the Defendants*
747 Third Avenue
New York, NY 10017
    By:  Tonianne Florentino, Esq.
        Adam Michael Harris, Esq., Of Counsel

**SPATT, District Judge.**

On June 4, 2012, the Plaintiff Marie Placide-Eugene (the "Plaintiff") commenced this action against the Defendants Visiting Nurse Service of New York ("VNSNY"), Eloise Goldberg ("Goldberg"), Jill Mendelson ("Mendelson") and Marian Haas ("Haas," and collectively, the "Defendants") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, et seq. ("Title VII"), 42 U.S.C. §§ 1981 and 1983 and the New York State Human Rights Law, New York State Executive Law § 290, et seq. (the "NYSHRL"). The Plaintiff asserts that the

Defendants unlawfully discriminated, harassed and retaliated against her (1) based on her race/color and national origin and (2) due to her complaints of discrimination.

On November 8, 2012, the Defendants moved to partially dismiss the Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure ("Fed R. Civ. P.") 12(b)(6). This motion is presently pending before the Court. In this regard, the Defendants moved to dismiss the portion of the Plaintiff's Title VII claim premised on national origin-based discrimination and retaliation, as well as harassment, which the Defendants presumed was a hostile work environment claim. However, the Defendants did not move to dismiss the portion of the Plaintiff's Title VII claim premised on race/color-based discrimination, retaliation and harassment. The Defendants further contended that the Plaintiff failed to state a claim against the Individual Defendants under §§ 1981 and 1983 because the Individual Defendants were not state actors and were not acting under color of state law, and also because the claim was barred by the doctrines of res judicata and collateral estoppel. Lastly, the Defendants notified the Court that the Plaintiff had agreed to withdraw all of her NYSHRL claims.

On December 7, 2012, the Plaintiff filed her opposition to the Defendants' motion to dismiss. In her opposition, the Plaintiff confirmed that she was withdrawing all of her NYSHRL claims. She also indicated that her "harassment" claim was, in fact, a hostile work environment claim. Moreover, the Plaintiff informed the Court that she was withdrawing her §§ 1981 and 1983 claim against the Individual Defendants. As such, the Individual Defendants Goldberg, Mendelson and Haas are no longer parties to this action and VNSNY is the only remaining Defendant. In addition, the only claim remaining in this action is the Plaintiff's Title VII claim, as it was brought against the Defendant VNSNY alone.

The Court also notes that the Plaintiff uses a footnote in her opposition memorandum, which is a violation of this Court's Individual Rule II.A. Notwithstanding this violation, the Court will consider the Plaintiff's memorandum while rendering its decision. However, the Court advises the Plaintiff's counsel that any future filings that contain footnotes will not be considered by this Court.

As indicated above, VNSNY only challenges the portion of the Plaintiff's Title VII claim that alleges discrimination, retaliation and hostile work environment based on national origin. Specifically, VNSNY's primary issue with the Plaintiff's national origin theory is that the Plaintiff does not identify the nurses that she claims received preferential treatment as non-Haitians, but rather, only identifies them as "white" or "Caucasian." Accordingly, the Court's discussion will primarily focus on whether the Plaintiff has stated a sufficient Title VII under a national origin theory only.

For the reasons set forth below, VNSNY's motion is denied in part and granted in part.

## I. BACKGROUND

Unless otherwise stated, the following facts are drawn from the Plaintiff's Complaint and construed in a light most favorable to the Plaintiff.

In this case, the Plaintiff is a black woman from Haiti, who speaks English with a heavy Haitian accent. On March 5, 2001, the Plaintiff was hired as a registered nurse for VNSNY by Denise Tranchina ("Tranchina"). The Complaint does not provide further details with respect to Tranchina's position at VNSNY. According to the Plaintiff, during her employment with VNSNY, she received satisfactory annual performance evaluations, as well as letters of gratitude from patients and family members for her service.

In 2007, Goldberg became the director for VNSNY's Nassau County branch, and in 2008, Mendelson became the manager of VNSNY's Nassau County branch. In addition in 2009, Mendelson became the Plaintiffs' direct supervisor. The Plaintiff alleges that VNSNY, Goldberg and Mendelson discriminated against the Plaintiff because of her race/color and national origin in that "[p]olicies and standards were applied differently to [the Plaintiff] and other nurses of color as compared to white nurses." (Compl., ¶ 12.) The Plaintiff's Complaint provides numerous examples in this regard.

For instance, the Plaintiff asserts that VNSNY regularly denied or reduced the number of days she requested for vacation, regardless of the timeliness of her submission and despite her seniority. In this regard, in 2010, the Plaintiff submitted a timely request for a vacation from August 2, 2010 until September 3, 2010. Goldberg denied the Plaintiff's vacation request and required that the Plaintiff work August 24, 2010 through August 26, 2010. A floating nurse, Marie Astride-Eugene ("Astride-Eugene"), agreed to cover the Plaintiff's shifts from August 24, 2010 through August 26, 2010, but Goldberg still refused to grant the Plaintiff's vacation request. Conversely, white nurses, such as Beth Grazulewicz ("Grazulewicz"), Debbie Starace ("Starace") and Kathy Zimberlin ("Zimberlin") were often permitted to take nine through 16 consecutive days of vacation. The Court notes that it appears Astride-Eugene shares part of the same last name with the Plaintiff. However the Complaint does not provide details as to their familial relationship, if any.

Further, when the grandmother of the Plaintiff's husband died, the Plaintiff's request for bereavement leave was denied. The Plaintiff even offered to use a personal day, but was not permitted to take the day off. Apparently, the bereavement leave requests of similarly situated white nurses, such as Eliz Childress ("Childress"), were not denied in the same manner.

In addition, according to the VNSNY handbook, full-time nurses are entitled to eight major holidays. These eight holidays are New Year's Day, Martin Luther King Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas. Nevertheless, the Plaintiff was required to work three major holidays in 2008, in addition to other regular holidays; two major holidays in 2009, in addition to other regular holidays; and two major holidays in 2010, in addition to other regular holidays. Moreover, in the first quarter of 2011, the Plaintiff had worked one major holiday and was scheduled to work at least one other major holiday. According to the Plaintiff, similarly situated white nurses, including Grazulewicz and Starace, were not required to work multiple major holidays.

Furthermore, VNSNY routinely denied the Plaintiff's requests for sick leave; asked her to produce doctor's notes; and accused her of faking illnesses. For example, on July 6, 2010, the Plaintiff became ill two days before her approved vacation time, but Mendelson demanded that the Plaintiff work. The Plaintiff's condition worsened throughout the day and at some point, she required immediate medical attention. The Plaintiff was diagnosed with bronchitis and strep throat. While at the doctor's office, the Plaintiff called VNSNY to report her diagnoses. However, Goldberg accused the Plaintiff of lying. When the Plaintiff's doctor faxed a note to VNSNY, Goldberg remarked "These doctor's notes keep popping up each time you need to take time off. . . ." (Compl., ¶ 15.)

Similarly, on December 30, 2010, the Plaintiff asked Mendelson for the day off due to illness, but Goldberg required that the Plaintiff work. Upon the Plaintiff's arrival at a new patient's home, the patient's wife refused to let the Plaintiff treat the patient and called VNSNY to complain that an obviously ill and potentially infectious nurse came to her house. The Plaintiff did not create medical notes regarding this incident, because medical notes are only

created when a case is opened and the Plaintiff did not open a case that day. However, the Plaintiff did document the incident in her Coordinator of Care ("COC") notes. Nevertheless, according to the Plaintiff, while she was out on leave, Mendelson and Goldberg accessed the Plaintiff's computer and altered her COC notes, which the Plaintiff was later forced by Goldberg to sign, although the notes had been changed. The Plaintiff asserts that sick leave requests of similarly situated white nurses, including Grazulewicz and Starace, were not similarly scrutinized and refused. In addition, the COC notes of white nurses were also not falsely modified by Mendelson and Goldberg.

The Plaintiff was also treated differently than white nurses with respect to discipline, as well as recognition for accomplishments. In this regard, in July 2010, the Plaintiff was threatened with disciplinary action after she was accused of bringing her child to work. Later, it was confirmed that the Plaintiff had not brought her child to work. Instead, a Caucasian coworker, Patrice Perricone ("Perricone") had been the one who had brought her children to work. Perricone was not disciplined.

In addition, on January 13, 2011, Starace confronted the Plaintiff concerning an email the Plaintiff had written. According to the Plaintiff, Starace came within inches of the Plaintiff's face and was screaming erratically. The Plaintiff submitted an incident report to Mendelson. Goldberg and Mendelson did not follow up with the Plaintiff regarding the incident. According to the Plaintiff, Starace was not disciplined for her behavior.

Furthermore, in March 2011, the Plaintiff received the highest score, over 90%, on the Santrax report. Santrax is a system by which VNSNY monitors field operations and tracks time, attendance, costs and services provided. However, although the Plaintiff received the highest score, Mendelson sent an email announcing that a Caucasian nurse, Kim Macaluso

("Macaluso"), had received the highest score and awarded her a gift card.  Mendelson's email included an attachment with all the nurses' scores, except for Macaluso's score.  A black nurse, Marie Desil ("Desil"), and the Plaintiff actually received the highest scores.  Desil confronted Mendelson about these results and, then, Mendelson announced that Desil, Macaluso and the Plaintiff would share the gift card.

On May 20, 2011, Mendelson asked the Plaintiff to cover an additional assignment at the home of one of the Plaintiff's regular patients.  The Plaintiff had not visited the patient earlier in the day because a Caucasian nurse, Justin Horigan ("Horigan"), had visited the patient instead.  Mendelson insisted that the Plaintiff carry out this assignment, although it would require the Plaintiff to work until 6:30 p.m., which was two hours past the time that nurses were supposed to finish for the day.  While conducting the visit, the patient's daughter informed the Plaintiff that Horigan had refused to address the patient's immediate concerns during his visit, stating that he "came to do the wound care, not the Foley care."  (Compl., ¶ 21.)  The Plaintiff reported to Mendelson and Goldberg that Horigan had not provided the required care to the patient.  However, according to the Plaintiff, Horigan was never disciplined for failing to provide appropriate care.

On May 23, 2011, a meeting was held with Desil, Goldberg, Mendelson, Massaro and the Plaintiff.  The Court notes that it appears that the Complaint does not further identify Massaro's first name or position at VNSNY.  At the meeting, Goldberg accused the Plaintiff of committing fraud with respect to her submitted time.  The Plaintiff replied that as a Coordinator of Care nurse, she did her field work from 8:30 a.m. until 4:30 p.m., but that she was also required to spend additional time outside of those hours on patient notes and on coordinating with multi-disciplinary professionals that were involved in her patients' care.  Mendelson was aware that the

Plaintiff worked on her documentation notes outside of the regular hours. The Plaintiff told Goldberg that she included the additional hours when she reported her time, as she had done for the previous ten years. In addition, the Plaintiff reminded Goldberg that she was a salaried employee who never voluntarily requested to work overtime. Consequently, according to the Plaintiff, she had no incentive to falsify her submission time.

Four days later, on May 27, 2011, VNSNY suspended the Plaintiff without pay and without providing a specific reason other than Goldberg's accusations that the Plaintiff had committed fraud when submitting her time. After making these accusations, VNSNY demanded that the Plaintiff return her company computer and cell phone. VNSNY made these accusations and the demand that the Plaintiff return her company computer and cell phone in front of the Plaintiff's colleagues, thereby humiliating the Plaintiff. According to the Plaintiff, similarly situated white nurses were not falsely accused and embarrassed in the presence of their colleagues. Thereafter, the Plaintiff received a discipline form which only contained unsubstantiated and vague allegations of inadequate patient care time; falsified submission of work time; and falsified reporting of visit time.

Apparently, as part of these allegations, VNSNY accused the Plaintiff of having allegedly misrepresented her whereabouts on May 20, 2011. However, according to the Plaintiff, that day she called VNSNY at 8:30 a.m., 8:34 a.m. and 8:38 a.m. to review her assignments. Moreover, she had been in touch with her manager throughout the day using her VNSNY-provided cell phone. Finally, in the afternoon, she called VNSNY and told Mendelson when she was leaving the field to complete her paperwork.

On June 3, 2011, on the Plaintiff's behalf, the law firm Leeds, Morelli and Brown, P.C. sent VNSNY a letter complaining that the Plaintiff had been subjected to race-based

discrimination. Exactly two months later, on August 3, 2011, the Plaintiff attended a meeting with Goldberg. The Plaintiff was accompanied by Jackie Roberts ("Roberts"), who was the Plaintiff's union representative. At the meeting, Goldberg gave the Plaintiff a discipline form with an additional charge from more than one year before the date of the August 3, 2011 meeting. The charge accused the Plaintiff of failing to appropriately identify a patient's deterioration. However, the charge did not include the patient's name, the date(s) of the Plaintiff's visit with the patient, or nursing notes from the Plaintiff or any other nurse. According to the Plaintiff, "[t]his charge was issued in furtherance of [VNSNY's] discriminatory motive and in retaliation for [the Plaintiff's] complaints of discrimination." (Compl., ¶ 25.)

In addition, at the August 3, 2011 meeting, Goldberg insisted that the Plaintiff return to work immediately, but required that the Plaintiff be put on "Final Warning Status" and subjected to a Performance Improvement Plan ("PIP"). However, the Plaintiff refused to sign a form consenting to these requirements. In this regard, the Plaintiff asked that Goldberg remove the "Final Warning Status" clause from the form, since this was the first time the Plaintiff received a warning. Nevertheless, Goldberg refused to omit the clause. The Plaintiff asserts that similarly situated white nurses, such as Lenore Bilger ("Bilger"), were not placed on "Final Warning Status" or forced to adhere to a PIP as a result of false and unsubstantiated accusations.

On August 22, 2011, the Plaintiff returned to work. The Plaintiff's Complaint is unclear as to whether the Plaintiff agreed to sign the form consenting to be placed on Final Warning Status. In any event, from August 22, 2011 through September 15, 2011, Mendelson accompanied the Plaintiff during her fieldwork, alleging it was pursuant to the PIP. However, despite accompanying her, Mendelson did not give the Plaintiff any recommendations for

improvement under the PIP. Instead, Mendelson repeatedly accused the Plaintiff of performance issues that were in fact attributable to other nurses.

Also, after the Plaintiff returned to work, Mendelson also began requiring that the Plaintiff come to the office before she went into the field. In this regard, the Plaintiff was forced to report to the office every morning and wait for Mendelson to hand her assignments, which usually occurred between 9:30 a.m. and 10:00 a.m. As a consequence, the Plaintiff had no choice but to start late and yet was still expected to complete the same workload of about six assignments before her scheduled end time at 4:30 p.m. According to the Plaintiff, while herself and another black nurse, Sharmaine Etienne ("Etienne"), were required to pick up their assignments in the morning before going into the field, similarly situated white nurses were not required to do so.

On August 25, 2011, the Plaintiff filed an administrative complaint of discrimination with the New York State Division of Human Rights ("NYSDHR").

On August 28, 2011, the Plaintiff arrived for a visit while accompanied by Mendelson. In private, the patient informed Mendelson that he was going to dinner in about 20 minutes and so, Mendelson decided to postpone the visit. However, Mendelson never provided an explanation to the Plaintiff as to why the visit was postponed nor did she ever inform the Plaintiff that the patient had refused the visit because of his dinner plans. Nevertheless, Mendelson later accused the Plaintiff of not recording that the visit had been "refused" despite the fact that the Plaintiff was never made aware of Mendelson's conversation with the patient.

The next day, on August 29, 2011, the Plaintiff inherited patient D.D. from another nurse, whose first name was Ramos but whose second name was not provided in the Plaintiff's Complaint. On the patient's Plan of Care, the "oxygen" box was checked, but the liter amount

was listed as "0" because the patient never used the oxygen tank. Mendelson accused the Plaintiff of not putting the liter amount on the patient's Plan of Care. However, white nurses Grazulewicz and Perricone cared for D.D. before and after the Plaintiff, engaged in the same conduct as the Plaintiff, but were not similarly accused.

On September 6, 2011, the Plaintiff reported to a patient's house, again accompanied by Mendelson. During the visit, the patient and the patient's spouse complained that Grazulewicz provided inadequate wound care and that Perricone did not provide adequate care or care time. In contrast, in Mendelson's presence, the patient praised the Plaintiff as one of two nurses who acted professionally in caring for her. Mendelson defended Grazulewicz and Perricone and apparently neither of these white nurses were disciplined. They were not reprimanded for inadequate patient care, suspended, subjected to supervision or recommended for a PIP, as the Plaintiff had been.

On that same day, September 6, 2011, the Plaintiff attended a meeting with Mendelson and Roberts, the union representative. At the meeting, Mendelson accused the Plaintiff of providing the wrong information to a patient's daughter and of putting the patient's life in danger. According to the Plaintiff, when she tried to reach a patient's private Home Health Aide, she accidentally dialed another patient's daughter. Nevertheless, the Plaintiff did not disclose any medical information regarding either patient with the daughter. Despite this, Mendelson wanted to bring a disciplinary action against the Plaintiff.

Also on September 6, 2011, the plaintiff sent a letter via the United States Postal service to VNSNY's Human Resources Vice President, Marian Haas ("Haas"), complaining about discrimination, harassment and retaliatory conduct. On September 8, 2011, allegedly in retaliation to the Plaintiff's complaint, Mendelson accused the Plaintiff of not properly

documenting a patient's notes. However, it was actually a white nurse, Rosemary Heutz ("Heutz"), who had failed to provide the proper documentation. According to the Plaintiff, "Heutz was not similarly reprimanded or forced to attend a meeting regarding her failure to properly document notes." (Compl., ¶ 32.)

The Plaintiff began to request that she receive overtime pay each time she was forced to stay past 4:30 p.m. The amount of the Plaintiff's overtime ranged from 30 minutes to two hours. For example, on September 14, 2011 and September 16, 2011, the Plaintiff was required to work to 6:30 p.m. The Plaintiff requested overtime for these extra hours. However, Mendelson at first informed the Plaintiff that Goldberg would not agree to that much overtime pay. Only after the Plaintiff threatened to file a union grievance did Goldberg agree to this overtime pay.

On October 5, 2011, the Plaintiff met with an Employee Relations Specialist, Keri McMullen ("McMullen"); a union representative, Raquel Webb Gedbes ("Gedbes"); and the Manager of Human Resources, Silvia Viciedo ("Viciedo"). The meeting concerned the Plaintiff's September 6, 2011 letter to Haas. At the meeting, McMullen and Viciedo advised the Plaintiff that VNSNY's Human Resources Department was investigating the Plaintiff's claims of discrimination. The following day, on October 6, 2011, the Plaintiff met with Haas, Goldberg, Massaro, Mendelson and Roberts concerning the grievance filed against the Plaintiff on August 3, 2011 and VNSNY's actions in May 2011, which included the Plaintiff's suspension.

On October 19, 2011, the Plaintiff and Mendelson agreed that the following morning, prior to reporting to VNSNY, the Plaintiff would first visit a patient's home at 9:00 a.m. However, on October 20, 2011, at approximately 9:30 a.m., Mendelson called the Plaintiff while the Plaintiff was conducting her visit with the abovementioned patient. Mendelson berated the Plaintiff for not being at the office.

On November 8, 2011, approximately one month after the Plaintiff's October 5, 2011 and October 6, 2011 meetings, Haas terminated the Plaintiff's employment with VNSNY. The reason given for the termination was that the Plaintiff had allegedly misrepresented her whereabouts on May 20, 2011. However, as indicated above, this alleged incident had been used against the Plaintiff in connection with her previous suspension on May 27, 2011. The Plaintiff points out that VNSNY had investigated this allegation and permitted the Plaintiff to return to work on a Final Warning Status and under a PIP, with which the Plaintiff complied. Despite this, the Plaintiff's employment was terminated due to this alleged incident, within just two months after the Plaintiff began to complain of discrimination to VNSNY's Human Resources Department.

According to the Plaintiff, VNSNY did not provide any new incidents as grounds for the termination of the Plaintiff's employment, nor did it provide any reason with respect to the delay in terminating her employment. In this regard, according to the Plaintiff, VNSNY's policy is typically to terminate an employee within ten days of a meeting regarding a grievance filed against an employee. In this case, the grievance at issue was filed in May 2011, but VNSNY did not hold a meeting regarding the grievance until October 2011. VNSNY then waited an additional month before terminating the Plaintiff's employment.

Thereafter, the Plaintiff, on an unspecified date, duly filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). On March 7, 2012, the EEOC issued a right to sue letter, and as stated above, on June 4, 2012 the Plaintiff commenced this action. The Plaintiff alleges that VNSNY's actions violated Title VII in that they constituted (1) unlawful discrimination on the basis of the Plaintiff's race/color and national origin; (2) unlawful retaliation against the Plaintiff due to her complaints of discrimination; and

(3) an unlawful hostile work environment on the basis of the Plaintiff's race/color and national

origin.  As a result of VNSNY's actions, the Plaintiff claims she suffered a loss of earnings and

benefits; future earnings and benefits; and emotional and physical damages.

## II.    DISCUSSION

## A.  Legal Standard on a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss

It is well-established that a complaint should be dismissed under Fed. R. Civ. P. 12(b)(6)

only if it does not contain enough allegations of fact to state a claim for relief that is "plausible

on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed.

2d 929 (2007).  Indeed, the issue on a motion to dismiss is "not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S.

232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).  "'Determining whether a complaint states a

plausible claim for relief will . . . be a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense.'"  Harris v. Mills, 572 F.3d 66, 72 (2d Cir.

2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1949–50, 173 L. Ed. 2d

868 (2009)).

In deciding a motion to dismiss, the Court is required to accept the material facts alleged

in the complaint as true and draw all reasonable inferences in the Plaintiff's favor.  Iqbal, 556

U.S. at 678; Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100

(1990); In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir. 2007).  As such, "[w]hen

there are well-pleaded factual allegations, a court should assume their veracity and . . . determine

whether they plausibly give rise to an entitlement of relief."  Iqbal, 556 U.S. at 679.  In its

analysis, the Court may refer "to documents attached to the complaint as an exhibit or

incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993); see also Karmilowicz v. Hartford Fin. Servs. Group, No. 11-3284-cv, 2012 U.S. App. LEXIS 18394, at *5–6 (2d Cir. Aug. 30, 2012).

However, "although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  Harris, 572 F.3d at 72 (quoting Iqbal, 556 U.S. at 678).  Only if this Court is satisfied that "the complaint cannot state any set of facts that would entitle the plaintiff to relief will it grant dismissal pursuant to Rule 12(b)(6)."  Hertz Corp. v. City of N.Y., 1 F.3d 121, 125 (2d Cir. 1993).

**B.  As to Whether the Plaintiff Stated A Valid Claim Under Title VII Based on a Theory of National Origin Discrimination, Harassment and Retaliation**

There is no doubt, and VNSNY does not contend otherwise, that the Plaintiff stated a valid Title VII claim premised under a theory of race/color-based discrimination and retaliation. The question before this Court, however, is whether the Plaintiff has asserted enough facts to assert a Title VII claim premised under a theory of national origin-based discrimination and retaliation.  In addition, with respect to the Plaintiff's allegations of "harassment," it appears that the Plaintiff intends to make out a hostile work environment claim, (see Pl. Opp., pg. 15–16), which VNSNY challenges, (see Def. Mem., pg. 8–10).  Thus, the Court will first examine the Plaintiff's national origin-based discrimination and retaliation claim before evaluating her hostile work environment claim.

**1. The Plaintiff's Title VII Claim Premised on a Theory of National Origin-Based Discrimination and Retaliation**

Generally, courts look to the Supreme Court's ruling in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), when analyzing Title VII claims. In <u>McDonnell Douglas</u>, the Supreme Court set forth the elements that a plaintiff must prove in order to establish a prima facie case at the summary judgment stage. However, "the survival of a complaint in an employment discrimination case does not rest on whether it contains specific facts establishing a prima facie case under <u>McDonnell Douglas</u>." <u>Lax v. 29 Woodmere Blvd. Owners, Inc.</u>, 812 F. Supp. 2d 228, 236 (E.D.N.Y. 2011). This is because, at the pleading stage, the Court does not apply the <u>McDonnell Douglas</u> burden shifting test used to analyze the evidentiary support for discrimination claims. <u>See</u> <u>Gonzalez v. Carestream Health, Inc.</u>, No. 12–4202–cv, 2013 WL 1296492, at *1 (2d Cir. Apr. 2, 2013) ("To survive a motion to dismiss, a complaint alleging workplace discrimination . . . need not allege specific facts establishing a prima facie case under <u>McDonnell Douglas</u>. . . ."); <u>Rosario v. City of New York</u>, No. 11–CV–09008 (PAC)(SN), 2013 WL 782408, at *6 (S.D.N.Y. Jan. 9, 2013), <u>adopted</u> <u>by</u> 2013 WL 78258, at *2 (S.D.N.Y. Mar. 1, 2013) ("An 'employment discrimination plaintiff need not plead a prima facie case of discrimination [under <u>McDonnell Douglas Corp. v. Green</u>].") (quoting <u>Bermudez v. City of New York</u>, 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011) (in turn, quoting <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 515, 122 S. Ct. 992, 999, 152 L. Ed. 2d 1 (2002))).

Rather, "[this Court] consider[s] only whether the complaint includes factual allegations sufficient 'to raise a right to relief above the speculative level.'" <u>Gonzalez v. Carestream Health Inc.</u>, 2013 WL at *1 (quoting <u>Twombly</u>, 550 U.S. at 555); <u>see</u> <u>also Boykin v. KeyCorp</u>, 521 F.3d 202, 212–13 (2d Cir.2008). In other words, "the Court asks only whether a plaintiff has *pled* a prima facie case, not whether a plaintiff has *established* that case. Thus, the standard is simply

whether [the] [P]laintiff's [C]omplaint, construed liberally, satisfies the federal pleading requirements for a claim" of retaliation. Hitchins v. NYC Dept. of Educ., No. 11–CV–4180 (RRM)(RML), 2013 WL 1290981, at *3 (E.D.N.Y. Mar. 28, 2013) (emphasis added).

Nevertheless, while a plaintiff need not allege specific facts establishing all the elements of a prima facie case under McDonnell Douglas, these elements can still "provide [a helpful] outline of what is necessary to render [a plaintiff's] claims for relief plausible." Sommersett v. City of New York, No. 09 Civ. 5916(LTS)(KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011). In this regard, under McDonell Douglas, a plaintiff alleging national origin discrimination "must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination.'" Ruiz v. County of Rockland, 609 F.3d 485, 491–92 (2d Cir. 2010) (citing Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008)). To establish a prima facie case of retaliation, the plaintiff must show "(1) that he engaged in protected . . . opposition, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006); see also Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007).

In this case, VNSNY's primary issue with the Plaintiff's national origin-based Title VII claim is that outside of identifying that the Plaintiff was a Haitian woman who spoke with a heavy Haitian accent, the Plaintiff's Complaint makes no other reference to national origin, particularly with respect to the national origin of the other nurses whom she claims received preferential treatment. Rather, the Plaintiff only asserts that similarly situated white or

Caucasian nurses were given preferential treatment.  According to VNSNY, this is insufficient because the terms "white" and "Caucasian" are not synonymous with the term "non-Haitian" and "[i]f [they] were, [the Plaintiff's] race discrimination claim under Title VII . . . would be indistinguishable from the national origin discrimination under Title VII, which cannot be so." (Def. Mem., pg. 4.)  In other words, VNSNY contends that the Plaintiff was required to plead that non-Haitian nurses were treated more favorably and/or that Haitian nurses were treated less favorably.

At the outset, the Court recognizes that in general, "[r]ace and national origin are ideologically distinct categories, and Title VII's text and legislative history reflects this distinction."  Brutus v. Silverseal Corp., 06 CIV. 15298 (LAP), 2009 WL 4277077, at *4 (S.D.N.Y. Nov. 24, 2009) aff'd, 439 F. App'x 28 (2d Cir. 2011); see, e.g., Benjamin v. New York City Dep't of Health, 144 F. App'x 140, 142 (2d Cir. 2005) ("[T]he District Court correctly found that Benjamin's administrative complaint, which focused exclusively on her 'dark skin' as the source of the discrimination she suffered, did not reasonably (or in fact) give rise to any administrative consideration of whether Benjamin suffered discrimination because of her Jamaican origin as opposed to her race.").  Nevertheless, the Second Circuit has held that "because racial categories may overlap significantly with nationality or ethnicity, the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible[.]"  Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003); see also Morales v. NYS Dep't of Labor, 865 F. Supp. 2d 220, 243 n. 6 (N.D.N.Y. 2012) ("National origin discrimination claims are often identical to corresponding race discrimination claims.").  Accordingly, "[w]here the line between national origin discrimination and racial discrimination is difficult to trace, courts have warned that '[a]n attempt to make such a demarcation before

both parties have had an opportunity to offer evidence at trial is inappropriate.'" Id. (quoting

Bullard v. OMI Georgia, Inc., 640 F.2d 632, 634–35 (5th Cir. Unit B 1981)); see also Morales,

865 F. Supp. 2d at 243 n. 6.

Several courts have permitted claims alleging both race-based discrimination and national

origin-based discrimination to proceed forward even where the Plaintiff initially only alleged one

type of discrimination and not the other. See, e.g., Rajaravivarma v. Bd. of Trustees for

Connecticut State Univ. Sys., 862 F. Supp. 2d 127, 146 (D. Conn. 2012) (holding that the

"[p]laintiff's claim for discrimination based on race is reasonably related to his claim for

discrimination based on national origin and would have undeniably fallen within the scope of the

[EEOC's] investigation"); Quinones v. Kohler Mix Specialties, LLC, CIV.A.309CV1979JCH,

2010 WL 1782030, at *3 (D. Conn. Apr. 30, 2010) (finding that "[t]he categories of Puerto

Rican and Hispanic could be said to 'substantially overlap,' and the line between the two might

be 'sufficiently blurred' that the EEOC would investigate both" where the plaintiff originally

made a claim of discrimination based on his national origin, but not on his race); Sharabura v.

Taylor, 03 CV 1866 (JG), 2003 WL 22170601, at *3 (E.D.N.Y. Sept. 16, 2003) (finding that an

EEOC complaint that included only a national origin claim but not a race claim, but alleged that

Russian nurses were fired and replaced by African-American nurses and that Russian nurses

were forbidden to speak Russian but that non-Russian nurses were permitted to speak in Creole,

"would no doubt alert the EEOC of the potential for race and color discrimination claims"). The

Court acknowledges that the courts in these cases were not analyzing the sufficiency of the

complaint filed in federal court, but rather, were determining the sufficiency of an EEOC or

administrative complaint in the context of an administrative exhaustion analysis. Nevertheless,

the Court finds that the reasoning of these cases is relevant and persuasive here.

In addition, of importance, "[t]he Court can take judicial notice of government statistics" Victoria Cruises, Inc. v. Changjian Cruise Overseas Traveal Co., 630 F. Supp. 2d 255, 263 n. 3 (E.D.N.Y. 2008) (citing, among other cases, City Bank Farmers' Trust Co. v. United States, 5 F. Supp. 871, 873 (S.D.N.Y. 1934) (in turn, citing Greeson v. Imperial Irr. Dist., 59 F.2d 529, 531 (9th Cir. 1932) ("[T]he court is bound to take notice of public facts and geographical positions, and also of populations of cities and counties, public documents, reports of Commissions made to Congress, and proceedings thereon, etc."))). In this regard, the Court notes that according to the CIA World Factbook, 95% of Haitians are black, while the remaining 5% of Haitians are mulatto and white. See CIA, the World Factbook: Haiti, available at https://www.cia.gov/ library/publications/the-world-factbook/geos/ha.html (last visited May 28, 2013); see also Nofal v. Jumeirah Essex House, 09 CIV 2994 PAC, 2010 WL 4942218 (S.D.N.Y. Dec. 3, 2010) (citing to CIA, the World Factbook); Wright v. Goldman, Sachs & Co., 387 F. Supp. 2d 314, 320 (S.D.N.Y. 2005) (same).

As such, in this case, the Court finds that a plausible inference can be made that the white or Caucasian nurses referenced in the Plaintiff's Complaint were, in all likelihood, also non-Haitians. Relying on this plausible inference, the Court finds that the Plaintiff's Complaint states a valid Title VII claim of national origin-based discrimination in that the Plaintiff, as a Haitian, was subjected to less favorable treatment than her non-Haitian counterparts. Accordingly, the Court denies VNSNY's motion to dismiss the Plaintiff's Title VII claim premised on national origin discrimination.

However, while the Court finds that such a plausible inference can be made, in an abundance of caution, the Court directs the Plaintiff to file an amended complaint, within ten days of the date of this Order, asserting that the white or Caucasian nurses referenced in her

Complaint were also non-Haitian if the Plaintiff believes that is factually correct. The Plaintiff may make these assertions upon information and belief. If the Plaintiff fails to do so, the Court will dismiss the Plaintiff's national origin-based discrimination claim with prejudice.

**2. The Plaintiff's Title VII Hostile Work Environment Claim**

VNSNY also argues that the Plaintiff "has failed to allege even the most basic elements of a hostile work environment claim based on national origin," because "she fails to plead a single incident of discriminatory intimidation, ridicule, insult, or any other incident that demonstrates a hostile work environment based on national origin." (Def. Mem., pg. 9.) The Court agrees.

In general, "[a] hostile work environment, in violation of Title VII, is established by a plaintiff showing that his or her workplace was permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Zhao v. State Univ. of N.Y., 472 F. Supp. 2d 289, 311 (E.D.N.Y. 2007) (citing Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000) (in turn, citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))) (internal quotation marks omitted); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000). "To plead a hostile work environment claim, [a] [p]laintiff must plead facts that would tend to show that 'the complained of conduct: (1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic].'" Argeropoulos v. Exide Technologies, 08-CV-3760 JS, 2009 WL 2132443, at *5 (E.D.N.Y. July 8, 2009) (citing Patane, 508 F.3d at 113) (alterations in the original).

Furthermore, "[a]n environment's hostility is assessed based on the 'totality of the circumstances,' which includes factors such as (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." Id. (citing Patane, 508 F.3d at 113).

Thus, "[i]n order to plead a legally sufficient claim for hostile work environment, plaintiff must allege comments which are sufficiently severe and pervasive as unreasonably to interfere with her job performance." Frierson v. NASDAQ/AMEX Mkt. Grp., 96 CIV. 7102 (WK), 2001 WL 262598, at *2 (S.D.N.Y. Mar. 14, 2001) (citing Harris v. Forklift Sys. Inc., 510 U.S. 17, 21–23, 114 S. Ct. 367, 370–71, 126 L. Ed. 2d 295 (1993) and Lopez v. S.B. Thomas, Inc. 831 F.2d 1184, 1189 (2d Cir.1987)). Moreover, "[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (citations and internal quotation marks omitted).

In this case, the Plaintiff has asserted no factual allegations that she was subjected to any severe or pervasive anti-Haitian comments. Rather, the Plaintiff merely points to how she was treated less favorably than presumably non-Haitian nurses. However, these "acts are [ ] not of sufficient magnitude to meet the applicable standard of severe intimidation, ridicule and insult" required in a hostile work environment claim. Ashok v. Barhart, 289 F. Supp. 2d 305, 313 (E.D.N.Y. 2003). Therefore, the Court grants VNSNY's motion to dismiss the Plaintiff's Title VII hostile work environment claim based on national origin.

In addition, while it appears that VNSNY has not challenged the Plaintiff's Title VII hostile work environment claim based on race/color, the Court finds that this claim is also deficient for the same reasons as the Plaintiff's national origin-based hostile work environment claim. Indeed, the Plaintiff makes no allegations in her Complaint that she was subjected to any racial slurs, epithets or remarks. See Hammod v. Zurich American Ins. Co., No. 09–CV–3219 (JS)(ARL), 2010 WL 3236777, at *6–7 (E.D.N.Y. Aug. 12, 2010) (dismissing a plaintiff's hostile work environment claims where she "fail[ed] to plead even a single fact that could give rise to a hostile work environment because of her age, race or national origin").

Accordingly, as the Court has the power to dismiss claims sua sponte for a failure to state a claim, the Court sua sponte dismisses the Plaintiff's hostile work environment claim based on race/color. See Leonhardv. U.S., 633 F.2d 599, 609 n. 11 (2d Cir. 1980); Byars v. Malloy, No. 3:11cv17 (SRU), 2011 WL 4538073, at *5 (D. Conn. Sept. 29, 2011).

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** that the Plaintiff's NYSHRL claims are dismissed; and it is further

**ORDERED** that the Plaintiff's 42 U.S.C. §§ 1981 and 1983 claims against the Individual Defendants Eloise Goldberg, Jill Mendelson and Marian Haas are dismissed and, as such, the Individual Defendants are dismissed from this action entirely; and it is further

**ORDERED** that the Defendants' motion to dismiss the Plaintiff's Title VII claim alleging discrimination and retaliation based on national origin is denied; and it is further

**ORDERED** that the Plaintiff is directed, within ten days of the date of this Order, to file an amended complaint asserting that the white or Caucasian nurses she references in her Complaint are also non-Haitians if the Plaintiff believes that is factually correct. The Plaintiff

may make these assertions upon information and belief.  Failure to do so will result in the dismissal of her Title VII claim alleging national origin-based discrimination and retaliation; and it is further

**ORDERED** that the Defendant's motion to dismiss the Plaintiff's Title VII harassment or hostile work environment claim based on national origin is granted; and it is further

**ORDERED** that the Court <u>sua</u> <u>sponte</u> dismisses the Plaintiff's Title VII harassment or hostile work environment claim based on race/color; and it is further

**ORDERED** that the caption in this action is amended to read as follows:


------------------------------------------------------------X
MARIE PLACIDE-EUGENE,

                         Plaintiff,

                -against-

VISITING NURSE SERVICE OF NEW YORK,

                       Defendant.
------------------------------------------------------------X

**SO ORDERED.**
Dated: Central Islip, New York
May 30, 2013

                             _____*/s/ Arthur D. Spatt*_____
                              ARTHUR D. SPATT
                      United States District Judge