**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
MARIE PLACIDE-EUGENE,

                    Plaintiff,

            -against-

VISITING NURSE SERVICE OF NEW YORK,

                    Defendant.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-2785 (ADS)(ARL)

<u>**APPEARANCES:**</u>

**White Ricotta & Marks, P.C.**
*Attorneys for the Plaintiff*
86-12 37th Avenue
Jackson Heights, NY 11372
    By:  Thomas Ricotta, Esq., Of Counsel

**Collazo Florentino & Keil LLP**
*Attorneys for the Defendant*
747 Third Avenue
New York, NY 10017
    By:  Tonianne Florentino, Esq.
         Adam Michael Harris, Esq., Of Counsel

**SPATT, District Judge.**

        On August 25, 2011, the Plaintiff Marie Placide-Eugene (the "Plaintiff") filed a claim of

discrimination with the New York State Division of Human Rights (the "NYSDHR), alleging

that her former employer, the Defendant Visiting Nurse Service of New York ("VNSNY") had

subjected her to discrimination due to her national origin.

        On March 7, 2012, the United States Equal Employment Opportunity Commission issued

to the Plaintiff a right to sue letter.

        On June 4, 2012, the Plaintiff commenced this action against VNSNY and certain former

supervisors, Eloise Goldberg ("Goldberg"), Jill Mendelson ("Mendelson") and Marian Haas

("Haas") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, *et seq.* ("Title VII"), 42 U.S.C. §§ 1981 and 1983, and the New York State Human Rights Law, New York State Executive Law § 290, *et seq.* (the "NYSHRL"). The Plaintiff asserts that the Defendants unlawfully discriminated, harassed, and retaliated against her (1) based on her race/color and national origin and (2) due to her complaints of discrimination.

On November 8, 2012, the Defendants moved to partially dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Fed R. Civ. P.") 12(b)(6). The Defendant challenged the portion of the Plaintiff's Title VII claim that alleged discrimination, retaliation, and hostile work environment based on national origin.

On December 7, 2012, the Plaintiff confirmed that she was withdrawing her NYSHRL and §§ 1981 and 1983 claims against the Individual Defendants. At that point, the VNSNY became the only remaining Defendant. In addition, the only claim remaining in this action was the Plaintiff's Title VII claim for discrimination and retaliation, as it was brought against the VNSNY alone.

On May 30, 2013, the Court denied the Defendant's motion to dismiss the Title VII claim alleging discrimination and retaliation based on national origin.

On June 4, 2013, the Plaintiff filed an amended complaint consistent with the May 30, 2013 order.

Following the completion of discovery, on May 22, 2014, VNSNY moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the amended complaint.

For the following reasons, VNSNY's motion for summary judgment is granted.

# I.    BACKGROUND

Unless otherwise stated, the following facts are drawn from the parties' Rule 56.1 Statements and exhibits and construed in a light most favorable to the non-moving party, the Plaintiff.  Triable issues of fact are noted.

## A.  The Parties

The Plaintiff's color is black, her race is black, and her national origin is Haitan. VNSNY is a not-for-profit organization that provides a range of home and community-based health care services.

## B.  The Plaintiff's Hiring

In 2001, VSNSNY hired the Plaintiff as a Registered Nurse.  The Plaintiff's job responsibilities included coordinating and providing multidisciplinary home-based healthcare services to patients residing Massapequa, Long Island and her scheduled work hours were Monday through Friday from 8:30 a.m. to 4:30 p.m.

During her employment with VNSNY, the Plaintiff was a member of a bargaining unit represented by the United Federation of Teachers, Local 2 (the "Union").  At all relevant times, VNSNY and the Union were parties to a collective bargaining agreement ("CBA").

When a VNSNY nurse visits a patient's home, the nurse is required to call Santrax, a call-in system that keeps track of a nurse's time and attendance, using the patient's telephone, and the nurse enters a unique code specific to the patient in order to document the nurse's arrival at the patient's home.  During her employment with VNSNY, the Plaintiff never found herself in a situation where the patient lacked a working telephone that she could use to call Santrax.  On October 11, 2011, Mendelson sent an email to several nurses in which she congratulated the

Plaintiff for achieving the highest score for placing timely calls into the Santrax call-in system in September 2011.

VNSNY issued a tablet computer to the Plaintiff to use when providing care during patient visits. A VNSNY nurse uses her VNSNY-issued tablet computer to document a patient's signature, to document that the patient was unable to sign, or to document that the patient forgot to sign.

C. Leave Time

When a VNSNY nurse wishes to schedule a vacation, the nurse is required to submit a vacation request to a VNSNY computer system called Work Brain. Vacation time for VNSNY nurses is scheduled based on seniority and the percentage of staff that is permitted to be absent at any given time, which is 10%. The Plaintiff submitted a request in calendar year 2010 for vacation time from August 23, 2010 to September 7, 2010. After her vacation request was denied, the Plaintiff submitted a new request for time off from August 30 to September 7, 2010, which was approved. Although the Plaintiff's request to use vacation time on August 26, 2010 and August 27, 2010 was denied, Mendelson and Goldberg scheduled her to work the weekend of August 21 and 22, 2010, so that she could be scheduled off on August 26 and 27, 2010. However, the Plaintiff contends that her vacation requests were routinely denied.

The Plaintiff concedes that she was never disciplined during her employment with VNSNY for excessive use of sick time, for using sick time to extend a vacation or a weekend, or for abusing sick time or medical leave

D. Bereavement Time

Pursuant to the CBA, bargaining unit members are entitled to three paid workdays for leave for death in family in the case of the death of a spouse, child, mother, father, sister, brother,

grandparent, mother-in-law, father-in-law, sister-in-law, brother-in-law, or other individual who lives in the same household as the employee.  Such leave must be taken at the time of the funeral.  Also, the CBA does not provide for leave for death in the family for a grandmother-in-law.  The CBA also provides that "[t]he Employer shall have the right, at its sole discretion, to require any employee to work on any of the holidays herein specified [New Year's Day, Martin Luther King Jr.'s Birthday, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day].  The Employer will, consistent with the needs of the Employer, distribute holidays on an equitable basis." (Goldberg Affid., Exh A.)  Finally, of relevance here, under the CBA, "[t]he Employer will assign holiday work on an equitable basis subject to operational requirements . . . Any Employee who has worked for the Employer for over fifteen (15) years will not be required to work holidays unless required for the effective and efficient operation of the Employer or Region / Program." (Id.)

The Plaintiff's husband's grandmother died in 2009, and in connection therewith, she requested bereavement leave.  However, the Plaintiff's sister-in-law, Marie Astride-Eugene, also an employee of VNSNY, requested a different weekend off to attend the funeral.

In November 2009, Mendelson informed the Plaintiff that her request for bereavement leave was not granted because the time was not authorized under the CBA.

E.  The December 30, 2010 Complaint

On December 30, 2010, a patient's wife ("the December 30, 2010 complainant") complained that the Plaintiff visited her home to see her husband; that the Plaintiff was coughing heavily; and that the Plaintiff was sick at the time of the visit.  The December 30, 2010 complainant stated her belief that the Plaintiff placed her husband at risk of contracting her illness.  The Plaintiff claims that, on this occasion, she was required to report to work despite

advising VNSNY officials that she was ill.  The parties dispute whether the Plaintiff and

Mendelson discussed this incident thereafter.  The Plaintiff was not disciplined in connection

with this complaint.

In the coordinator of care note she had prepared relating to the encounter described by the

December 30, 2010 complainant, the Plaintiff wrote: "The case is not opened; vn reported to pt's

residence to open the case even though vn was not feeling well; pt's wife noted that vn was

coughing incessantly; she requested for vn to stop providing the care to her husband; she stated

that her husband is undergoing chemotherapy, has a weakened immune system and prone to

infection; vn concurred and notified psm Jill." (Mendelson Aff. At ¶ 30, Exh. M)

F.  The May 18, 2011 Complaint

On May 18, 2011, the wife of a VNSNY patient ("May 18, 2011 complainant") contacted

Mendelson to file a complaint about the Plaintiff.  The May 18, 2011 complainant told

Mendelson that the Plaintiff never took off her jacket during the visit and that the Plaintiff was at

the house for 30-45 minutes or less.

G.  The May 20, 2011 Complaint

During the afternoon of May 20, 2011, Mendelson received a telephone call from the

daughter of one of the Plaintiff's assigned patients for that day (the "May 20, 2011

complainant") for the purpose of submitting a complaint about the Plaintiff.  The May 20, 2011

complainant stated that the Plaintiff left her a telephone message the night before, stating that she

would visit the patient between 11:00 a.m. and 12:00 p.m. the next day.  The May 20, 2011

complainant allegedly told Mendelson that on May 20, 2011, the Plaintiff arrived at the patient's

home at 1:00 p.m., when the patient was no longer home.

The Plaintiff maintains that she arrived at the patient's home at 10:30 a.m, at which time she was advised that the patient had forgotten that she would be visiting and was not home at the time.

H.  The May 20, 2011 Catheter Patient Incident

On May 20, 2011, one hour before the end of the Plaintiff's scheduled work hours, her supervisor, Mendelson, telephoned the Plaintiff and directed her to visit a patient in Massapequa to address the patient's leaking foley catheter.

The Plaintiff told Mendelson that she was almost home in Suffolk County and near the Smith Haven Mall.  The Plaintiff adds that, prior to this call, at about 2:30 p.m., the Plaintiff called Mendelson and advised her that she was finished with her visits for the day and was, as per normal company practice, heading home to complete her reports and paperwork relating to her daily visits.  The Plaintiff told Mendelson during the 3:30 p.m. telephone conversation that, due to traffic, it would take her two hours to reach the catheter patient and that the visit would be after her regular work hours.  The Plaintiff queried Mendelson as to whether she would be paid extra compensation for this visit.

The Plaintiff stated at her deposition that the home health aide for the patient told her that a white nurse, Justin Horrigan, had previously declined to deal with the issue, yet he was not disciplined.

Following this conversation, Mendelson spoke with Denise Massaro ("Massaro"), VNSNY Clinical Director of Nassau County and Mendelson's own supervisor, about the Plaintiff's response to Mendelson's direction that the Plaintiff visit the catheter patient.  Massaro called the Plaintiff to verify that she would visit the patient, and at or about 6:00 p.m. on May 20, 2011, the Plaintiff arrived at the home of the patient.

I.  VNSNY Begins its Investigation

Massaro, Mendelson, and Goldberg subsequently began an investigation of the Plaintiff's patient visits on May 20, 2011.  As part of their investigation, Mendelson, Goldberg, and Massaro obtained and reviewed a Service Charge Processing report concerning the Plaintiff from VNSNY's Information Systems Department from May 19, 2011 and May 20, 2011.  The report indicated the number of patients the Plaintiff visited; whether she visited those patients in the morning or afternoon hours; and the duration of the visits as recorded by the Plaintiff.

According to the Plaintiff's Service Charge Processing report for May 20, 2011, she recorded that she had visited six patients on May 20, 2011, and had visited all of her patients during afternoon hours.  Further, although the Plaintiff had left Massapequa before 3:30 p.m., according to the Service Charge Processing report for May 20, 2011, for four of her patients, she provided care for a period of one hour each; for another patient, care lasted two hours; and for the remaining patient, her care lasted twenty minutes.

In addition, Massaro, Goldberg, and Mendelson obtained and reviewed the Plaintiff's clinical notes for the patient who required the replacement of a foley catheter on May 20, 2011.  In the Plaintiff's clinical note, she recorded: "VN rec'd call from PSM at 3:38 pm who demanded for VN to go to pt's home after working hrs to change the pt's foley cath that was leaking; PSM threatened to deduct 1hr from VN's paycheck if VN does not carry out the assignment; she stated that she will notify Denise about the above." (Mendelson Aff. Exh. D.)  The Defendants deny that Mendelson threatened to deduct any time from the Plaintiff's paycheck if she failed to carry out the May 20, 2011 assignment on the catheter patient.

The Plaintiff also recorded in the medical records that "during the visit pt's daughter stated she informed the office around noon time that pt's foley was leaking; vn rec'd call from

psm jill at 3:30 pm and she demanded for vn to go to pt's home to change the foley cath; vn informed psm that it will take vn 2 hrs to carry out the assignment and that would extend into after working hrs; vn called psm at 5:05 pm to notify her that vn was sitting in traffic; vn arrived at pt's home at 6:09; the existing foley was removed and the new foley reinserted with return of 50 cc of clear urine; pt tolerated tx well." (Id.).

J.  The May 23, 2011 Meeting

On May 23, 2011, the Plaintiff attended a meeting with Goldberg, Mendelson, Massaro, and Marie Desil, a union representative ("Desil").  The Defendant states that, at this meeting, Goldberg directed the Plaintiff to explain where she was at the beginning of her work day on May 20, 2011.  The Defendant further states that Goldberg, Mendelson, and Massaro showed the Plaintiff the Service Charge Processing report and discussed comments the Plaintiff made in the catheter patient's medical record.   Finally, the Defendants maintain that the Plaintiff was told that she was suspended pending further investigation.

The Plaintiff states that this meeting lasted only a few minutes and that she was accused of fraud.

Later that day, Massaro had a telephone conversation with Cris Ruiz, Employee Relations Manager ("Ruiz") about the Plaintiff's patient visits on May 20, 2011 and the documentation Massaro reviewed.

K.  The Subsequent Investigation

On May 26, 2011, Goldberg, Mendelson, and Massaro had a telephone conversation with Ruiz to discuss the meeting on May 23, 2011 and the results of VNSNY's investigation during the week of May 23, 2011.  During this conference, Goldberg, Mendelson, and Massaro

allegedly told Ruiz that during the May 23, 2011 meeting, the Plaintiff stated that she visited her first patient at 9:30 a.m. on May 23, 2011.

However, this assertion by the Plaintiff contradicted the Plaintiff's visit signature reports from May 2011 from VNSNY's Information Systems Department. The visit signature reports identify the times when each patient signed the Plaintiff's tablet to verify the occurrence of the visit. The visit signature report from May 20, 2011 showed that the Plaintiff obtained her first patient's signature at 12:50 p.m. The Plaintiff maintains that her first visit was scheduled for 10:30 a.m., but as the patient was not home, the Plaintiff did not meet with the patient, call into Santrax, or obtain the patient's signature.

As part of her investigation, Goldberg obtained visit signature reports for 15 nurses working in Nassau County, selected at random, from VNSNY's Information Systems Department. The visit signature reports for the fifteen randomly selected nurses in Nassau County showed longer average times between patient visits than the Plaintiff's visit signature reports showed, and they showed patient signatures in both the mornings and afternoons on each day. Goldberg observed in the course of her investigation that the Plaintiff visited her patients either all in the morning or all in the afternoon, whereas other VNSNY nurses visited their patients during the morning and afternoon.

The visit signature reports obtained for the Plaintiff in May 2011 showed that there were instances in which there was less than ten minutes between patient signatures. In this regard, Goldberg believed that the visit signature reports obtained for the Plaintiff in May 2011 showed that the Plaintiff's patient visits were abbreviated because, for example, three successive patient signatures were obtained within less than 30 minutes, so that the amount of time spent with the middle patient was unlikely to be adequate.

The Plaintiff maintains that she treated patients in the same geographic area, and sometimes on the same block and could have had someone sign at the end of her visit and then another sign right away at the beginning and that would not be cause for concern or a problem.

L. The Plaintiff's Suspension

On May 27, 2011, the Plaintiff attended a meeting in Goldberg's office with Mendelson, Goldberg, Massaro, and Jacqueline Vaughan Roberts ("Roberts"), a union representative. During this meeting, Goldberg informed the Plaintiff that the reports Mendelson, Massaro, and Goldberg obtained and reviewed demonstrated that the Plaintiff had conducted abbreviated visits to patients and that the Plaintiff's oral account of events on May 20, 2011 during the May 23, 2011 meeting was not consistent with the reports. The Plaintiff claims that she never provided an account of events at the May 23, 2011 meeting.

The Defendants further contend that the Plaintiff did not give any explanation for the discrepancies Goldberg identified or for her abbreviated patient visits. The Plaintiff counters that she was never provided an opportunity to do so.

At the end of the May 27, 2011 meeting, Goldberg told the Plaintiff that she was suspended from employment pending further investigation. Goldberg instructed the Plaintiff to return her tablet and cell phone to VNSNY. A discipline form was provided to Jacqueline Roberts, the Plaintiff's union representative, who then faxed the form to Plaintiff.

During the Plaintiff's suspension, Goldberg, Massaro, and Mendelson obtained and reviewed visit signature reports from VNSNY's Information Systems Department for the Plaintiff for the months of April and May 2010 to determine whether the Plaintiff's pattern of concentrating patient visits in part of the work day predated the prior period of investigation. Goldberg, Massaro, and Mendelson ultimately concluded that the Plaintiff's visit signature

reports from April and May 2010 revealed similar abbreviated workdays and patient visits that typically lasted less than thirty minutes. According to the Plaintiff, her annual performance evaluations and monthly productivity reports never indicated any issues with her performance, and she always provided the adequate amount of time for a patient to provide proper care.

On June 3, 2011, the Plaintiff, through her attorneys, sent a letter to VNSNY alleging that she was being subjected to discrimination in the course of her employment at VNSNY.

M. The Plaintiff's Suspension is Lifted

On July 22, 2011, Goldberg mailed a letter to the Plaintiff directing the Plaintiff to contact Goldberg to schedule a meeting to discuss the results of VNSNY's investigation and the outcome of the Plaintiff's suspension from employment.

On August 3, 2011, the Plaintiff met with Mendelson, Massaro, Goldberg, and Roberts. At this meeting, Goldberg described the visit signature reports that she reviewed during the Plaintiff's suspension. The Plaintiff received a revised discipline form which stated that the Plaintiff had been suspended from employment and she was being placed on a Performance Improvement Plan ("PIP"). Pursuant to the PIP, the Plaintiff was required to: report to the Nassau office at 8:30 a.m. each work day; review her workday with her manager prior to leaving the office; telephone her manager each day when her field visits were concluded; review her daily schedule with her manager prior to leaving the office; meet with her manager two times per week to review work to ensure appropriate care; increase observed field visits with the orientation nurse; follow up with select patients; and meet with the orientation nurse regarding documentation of visit times.

Goldberg told the Plaintiff that her suspension had been lifted. The Defendants assert that the Plaintiff requested time to consider the discipline and the PIP before she decided whether

to return to work.  The Plaintiff states that she only asked that she be permitted to fax a copy of the discipline form to her attorney.

Regardless, on August 9, 2011, Goldberg mailed a letter to the Plaintiff, in which Goldberg directed the Plaintiff to advise her by August 12, 2011 whether she intended to return to work.  In that letter, Goldberg confirmed that the Plaintiff had previously scheduled approved vacation time for the week of August 15, 2011 which Goldberg would honor if the Plaintiff decided to return to work.

On August 17, 2011, Goldberg mailed a letter to the Plaintiff in which Goldberg directed her to report to work on August 22, 2011, and that if she did not report to work on that date, she would be deemed to have resigned from employment with VNSNY.  On August 22, 2011, the Plaintiff returned to work.

On September 7, 2011, Mendelson met with the Plaintiff to discuss the objectives of the PIP.  Mendelson explained to the Plaintiff that the PIP was a learning experience to enable her to perform her job better and to ensure adherence to standards of care and documentation; that the PIP was not punitive; that Mendelson believed that the Plaintiff had the ability and intelligence to improve; that the Plaintiff demonstrated better compliance and provision of teaching guides, that a patient had complimented her care; and gave the Plaintiff positive feedback on noticing the weight gain of a patient with congestive heart failure.  The Plaintiff does not recall any such meeting.

N.  The August 29, 2011 Complainant

On August 29, 2011, a patient's daughter (the "August 29, 2011 complainant") complained to Mendelson that on August 25, 2011, the Plaintiff told her that she should give her father (the patient) "the increased dose of Lasix 40mg prescribed by his cardiologist at St.

Francis Hospital." (Mendelson Affid, at ¶ 23.)  The August 29, 2011 complainant stated to

Mendelson that her father was not currently on Lasix and did not have a cardiologist at St.

Francis Hospital.

The August 29, 2011 complainant stated to Mendelson that she disputed the point with

the Plaintiff several times but that the Plaintiff persisted in repeating the instructions.  The

Plaintiff concedes that, on this occasion, she had called the wrong patient but, upon learning this

error, immediately apologized and ended the phone call.  The August 29, 2011 complainant

allegedly told Mendelson that she lacked confidence in the Plaintiff's ability to provide safe care

to her father because of the misinformation provided to her regarding her father's medication

management.

On September 6, 2011, Mendelson met with the Plaintiff to discuss the August 29, 2011

complaint.  The Plaintiff stated that she did not believe the incorrect information provided to the

wrong patient constituted a serious issue because "nothing happened to the patient." (Id. at ¶ 24.)

Mendelson counseled the Plaintiff that there was a potential for a serious error in a situation like

this, and advised the Plaintiff to collect her information and facts in a calm environment before

providing instructions to patients or their family members via the telephone.  Nevertheless,

Mendelson acknowledged that the Plaintiff performed in a satisfactory manner as a nurse for

VNSNY.

O.  The September 6, 2011 Letter

On September 6, 2011, the Plaintiff sent a letter to Marian Haas, Vice President, Human

Resources Policy & Practice at VNSNY, in which she complained of discrimination and

harassment.  The Plaintiff alleged that Goldberg and Mendelson denied or reduced her requests

for vacation days; Goldberg and Mendelson denied her requests for sick leaves; Goldberg and

Mendelson accused her of faking illness; Goldberg and Mendelson denied her bereavement leave request when her husband's grandmother died; and that her suspension and performance improvement plan were discriminatory. Haas assigned Keir McMullen ("McMullen"), Employee Relations Specialist, and Silvia Viciedo ("Viciedo"), Manager, Human Resources, to investigate the Plaintiff's September 6, 2011 complaint.

On September 28, 2011, Haas sent the Plaintiff a letter in which Haas stated that she received the Plaintiff's September 6, 2011 letter and that she had assigned McMullen and Viciedo to investigate the Plaintiff's September 6, 2011 allegations. On October 5, 2011 and October 12, 2011, McMullen and Viciedo met with the Plaintiff regarding her September 6, 2011 letter. McMullen and Viciedo were not involved in any disciplinary matters concerning the Plaintiff, including the Union grievance relating to her suspension.

On November 15, 2011, McMullen and Viciedo advised Plaintiff that their investigation of Plaintiff's allegations in the September 6, 2011 Letter revealed no evidence of discrimination.

P. The Grievance Meetings

Following the imposition of the suspension, the Union filed a grievance on the Plaintiff's behalf, alleging that the suspension was improper.

Pursuant to the grievance and arbitration process in the CBA, on October 6, 2011, the Plaintiff and her Union representatives, Roberts and Angela Kahn ("Kahn"), met with Goldberg, Haas, Massaro, and Ruiz to discuss the grievance the Union had filed regarding the Plaintiff's suspension from employment. Prior to this meeting, the Plaintiff spoke with Kahn.

During the October 6, 2011 meeting, Kahn orally presented to VNSNY management a timeline of the Plaintiff's work day on May 20, 2011.

15

Kahn stated to VNSNY management that on May 20, 2011, the Plaintiff began working in the field at 8:30 a.m. and was sitting in a parked car in front of a patient's house for three hours, from 8:30 a.m. until 11:30 a.m. Kahn further stated to VNSNY management on the Plaintiff's behalf that her first patient on May 20, 2011 was diabetic and required an insulin injection. Kahn also stated to VNSNY management that the Plaintiff spent the three hours in her parked car in front of a patient's home completing documentation.

Of importance, the Plaintiff questions the adequacy of Kahn's "representation" and states that some of what he represented during that meeting was inaccurate, although she concedes she did not state anything to this effect during the October 6, 2011 meeting. For example, the Plaintiff concedes that she did not spend the first three hours of her work day on May 20, 2011 completing documentation in her parked vehicle.

Goldberg stated to Kahn, Roberts, and the Plaintiff that in May 2011, when she asked the Plaintiff to describe her patient visits on May 20, 2011, the Plaintiff reported that her visits on May 20, 2011 were at 9:30 a.m., 11:30 a.m., 12:45 p.m., 2:00 p.m., and 2:15 p.m. Haas handed Roberts a copy of the Plaintiff's visit signature report from May 20, 2011. Ruiz explained the visit signature report, which indicates that patients signed the Plaintiff's tablet, verifying that patient visits had occurred, on May 20, 2011 at 12:50 p.m., 1:05 p.m., 1:45 p.m., 2:10 p.m., and 5:51 p.m. VNSNY representatives also stated that the Plaintiff made 53 minutes of telephone calls from her VNSNY-issued cell phone on May 20, 2011, of which 26 minutes were work related and 27 minutes were personal.

Following the October 6, 2011 meeting, VNSNY representatives informed the Plaintiff and the Union that the relevant documents would be reviewed and that they would respond further at a later point. VNSNY adjourned the grievance meeting to investigate the Union's

allegations during the October 6, 2011 meeting about the Plaintiff's whereabouts on May 20, 2011

Haas and Ruiz subsequently obtained and reviewed phone records for the Plaintiff's work-issued cell phone for May 20, 2011. On May 20, 2011, the Plaintiff had her VNSNY-issued cell phone with her the entire time she was working; she did not lend her VNSNY-issued cell phone to anyone during May 20, 2011; and she had no other cell phones with her on May 20, 2011 during the time she was working.

VNSNY permitted nurses to make personal calls from their VNSNY-issued cell phone. The Plaintiff never made personal phone calls in the presence of VNSNY patients.

The cell phone records showed that on May 20, 2011, the Plaintiff placed calls on her VNSNY-issued cell phone from Suffolk County until at least 9:32 a.m., which the Defendants claim is inconsistent with the Union's and the Plaintiff's assertion that she was in her Massapequa-based patient care area at that time. The Plaintiff claims that between 9:30 and 10:30, she was driving from her home in Suffolk County to her work health area in Massapequa.

On November 8, 2011, the Plaintiff met with Haas, Goldberg, Ruiz, and Union representative Raquel Webb-Geddes to discuss the documents that Goldberg, Ruiz, and Haas reviewed after the October 6, 2011 meeting. Haas showed the Plaintiff and the Union representatives certain telephone records for the Plaintiff's VNSNY-issued cell phone for May 20, 2011. Haas also showed the Plaintiff and the Union representatives a map and explained that VNSNY had marked the Plaintiff's whereabouts at different times on May 20, 2011 on the map using the Plaintiff's cell phone records. Haas told the Plaintiff and the Union representatives that the Plaintiff's VNSNY-issued cell phone records from May 20, 2011 showed that at 8:30 a.m., 8:34 a.m., 8:35 a.m., 8:38 a.m., and 9:32 a.m., on May 20, 2011, she made telephone calls to the

VNSNY office while she was in Suffolk County. The Plaintiff did not respond to the timeline that the cell phone records showed.

During the November 8, 2011 meeting, the Plaintiff conceded that portions of what her representatives said on her behalf at the October 6, 2011 meeting were not accurate. For instance, the Plaintiff stated that, contrary to Kahn's prior representations, she did not sit in front of a patient's home from 8:30 a.m. until 11:30 a.m. on May 20, 2011.

Haas further told the Plaintiff and the Union representatives that the Plaintiff's representative stated, during the October 6, 2011 meeting, that her first patient visit on May 20, 2011 took place 11:30 a.m., but that the Plaintiff's VNSNY-issued cell phone records for May 20, 2011 showed that on May 20, 2011, she was making and receiving calls on her VNSNY-issued cell phone between 11:34 a.m. and 12:24 p.m. The Plaintiff did not respond to this assertion.

At the end of the November 8, 2011 meeting, Haas asked the Plaintiff if there was anything else she would like to say. The Plaintiff did not make any further comments.

Hass ultimately denied the Union's grievance challenging the Plaintiff's suspension. The Court notes that the Union has not filed a grievance challenging the Plaintiff's termination nor sought arbitration of the Plaintiff's grievance challenging the suspension.

Q. The Termination of the Plaintiff's Employment

Also, on November 8, 2011, Haas terminated the Plaintiff's employment on the basis that she had misrepresented her whereabouts on May 20, 2011. The Plaintiff claims that Haas's actions and motivations were guided by a desire to terminate her in retaliation for her complaints of discrimination. This action ensued.

## II. DISCUSSION

A.  The Legal Standard on Summary Judgment

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Nunn v. Mass. Cas. Ins. Co., 758 F.3d 109, 114 n. 4 (2d Cir. 2014).  Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue for trial, and cannot rely merely on allegations or denials contained in the pleadings. See Fed. R. Civ. P. 56(c); accord Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011)(citation omitted).

In cases involving claims of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)(citation omitted).  Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).  Ultimately, the test for summary judgment is whether "a reasonable jury could return a verdict for the nonmoving party." Nunn, 758 F.3d at 114 n. 4 (citation omitted).

B.  The Title VII Claim of Discrimination

The parties agree that, for purposes of summary judgment, the Plaintiff's claim of discriminatory termination is analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case by proving that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred in circumstances giving rise to an inference of discrimination. See id. at 802; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The "burden of establishing a prima facie Title VII case is *de minimis*." Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009)(internal quotation and bracket marks omitted).

If the plaintiff proves a *prima facie* case, the burden of production shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse employment action. See Burdine, 450 U.S. at 254–55.  If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the adverse action was based, "at least in part," on discrimination. See Holcomb v. Iona Coll., 521 F.3d 130, 138, 141 (2d Cir. 2008).  Importantly, at this final step "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." Id. at 141 (internal quotation marks omitted); see also 42 U.S.C. § 2000e–2(m).

Here, VNSNY concedes that the Plaintiff is a member of a protected class; that she was qualified for the position of VNSNY nurse; and that she suffered "adverse employment actions"

in the form of her suspension and termination of employment.  However, VNSNY contends that

none of the other complained-of conduct constituted an "adverse employment action" and that, in

any event, the circumstances surrounding each instance of complained-of action does not support

an inference of discrimination.  VNSNY further contends that, even if the Plaintiff could make

out a *prima facie* case of discrimination, the Plaintiff's misrepresentation of her whereabouts on

May 20, 2011 and her pattern of unacceptably abbreviated patient visits supplied a legitimate

reason for the suspension.  Also, VNSNY contends that the Plaintiff allowing Kahn to make

false statements on her behalf at the October 6, 2011 Grievance meeting supplied a legitimate

reason for her termination.   In essence, VNSNY contends that the Plaintiff cannot prove that it

intentionally discriminated against her.

The Court pauses to consider whether there were any additional "adverse employment

actions" taken against the Plaintiff.   A plaintiff suffers an "adverse employment action" under

Title VII when "he or she endures a 'materially adverse change' in the terms and conditions of

employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.

2000)(quoting Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)).

A materially adverse change is a change in working conditions that is "more disruptive than a

mere inconvenience or an alteration of job responsibilities." Galabya, 202 F.3d at 640 (quoting

Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993))(internal

quotation marks omitted).  "Examples of materially adverse employment actions include

'termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, [and] significantly diminished material

responsibilities. . . .'" Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)(quoting Galabya,

202 F.3d at 640).

In this case, the Plaintiff appears to argue that she suffered "adverse employment actions," in addition to her suspension and termination, in that (1) she was denied sick leave, vacation time, and bereavement leave; (2) she was assigned too many cases; (3) VNSNY erroneously rewarded a white employee for the Plaintiff's Santrax compliance; (4) her supervisors wrongly accused her of misconduct; and (5) the PIP was applied unfairly to her.

Even assuming any of these actions rose to the level of an "adverse employment action" as is required to state a traditional discrimination claim under Title VII, the Court finds that the Plaintiff has failed to establish a genuine issue of material fact that any occurred under circumstances giving rise to an inference of discrimination on the basis of race, color, or national origin.

An inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." Abdul–Hakeem v. Parkinson, 523 Fed. Appx. 19, 20 (2d Cir. 2013)(quoting Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493 (2d Cir. 2010)); see also Shlafer v. Wackenhut Corp., 837 F.Supp.2d 20, 25 (D. Conn. 2011)("Discriminatory motivation may be established by allegations of preferential treatment given to similarly situated individuals, or remarks conveying discriminatory animus." (citations omitted)); Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381, 392 (S.D.N.Y. 2011)( "Allegations supporting motive may include preferential treatment given to similarly situated individuals. . . .").  Such a showing "is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." Ruiz, 609 F.3d at 493 (internal quotation marks omitted)(italics added).  "The 'standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,' such that 'the comparator must be similarly situated to the

plaintiff in all material respects.'" <u>Abdul–Hakeem</u>, 523 Fed. Appx. at 21 (quoting <u>Ruiz</u>, 609 F.3d at 494); <u>see also</u> <u>Ugactz v. United Parcel Serv., Inc.</u>, No. 10–CV–1247 (MKB), 2013 WL 1232355, at *16 (E.D.N.Y. Mar. 26, 2013)("Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." (alteration, citation and internal quotation marks omitted)).

        "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." <u>Abdul–Hakeem</u>, 523 Fed. Appx. at 21 (quoting <u>Ruiz</u>, 609 F.3d at 493–94 (internal quotation marks omitted)); <u>see also</u> <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39–40 (2d Cir. 2000)("We have said that to satisfy <u>Shumway [v. United Parcel Serv., Inc.</u>, 118 F.3d 60, 63 (2d Cir. 1997)] 'all material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards. In addition, the standard we used in Shumway requires plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct." (citations omitted)). The determination of "whether other employees are similarly situated is a factual issue that should be submitted to a jury, but '[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" <u>Sweeney v. Leone</u>, No. 05–CV–871 (PCD), 2006 WL 2246372, at *13 (D. Conn. July 31, 2006)(quoting <u>Harlen Assoc. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 499 n. 2 (2d Cir. 2001)); <u>see also</u> <u>Lugo v. City of New York</u>, 518 Fed. Appx. 28, 30 (2d Cir. 2013)(the plaintiff had not

provided "any information from which a reasonable jury could conclude that the officers referenced were similarly situated to" the plaintiff).

In this case, with regard to the alleged wrongful denials of sick leave, the Plaintiff fails to identify any non-black or non-Haitian nurses whose requests were treated more favorably.

As to the denial of bereavement leave, the Plaintiff does not dispute that Mendelson denied her request because leave for the passing of a grandparent of an employee's spouse was not authorized under the CBA, but nonetheless claims that "Liz" – whose race, color, national origin, job title, and supervisors are unclear – was treated more favorably. However, the Plaintiff concedes that she does not know whether "Liz" received bereavement leave due to the passing of her own grandmother or that of her spouse.

The Court also finds that the Plaintiff has failed to proffer sufficient evidence of "similarly situated" VNSNY employees who were denied vacation leave requests.

Similarly, with regard to the Plaintiff's case load, she admits that she does not know how it compared to that of her colleagues.

As noted above, the Plaintiff also alleges that Mendelson erroneously announced during a team meeting that a white nurse, Kim Macaluso ("Macaluso"), had achieved the highest percentage visits properly utilizing Santrax, and presented Macaluso with a $5 gift card. During the meeting, Desil brought to Mendelson's attention that fact that she and the Plaintiff had, in fact, achieved the highest percentage. Mendelson subsequently awarded gift cards to both the Plaintiff and Desil. In any event, the Court finds that there is no evidence that this incident occurred under circumstances giving rise to an inference of discrimination on the basis of race, color, or national origin.

The Plaintiff further alleges that Mendelson wrongfully accused her of various acts of misconduct, such as failing to record an amount of oxygen on a patient's plan of care. However, she fails to point to "similarly situated" VNSNY employees who engaged in the same conduct yet were not wrongfully accused.

Relatedly, the Plaintiff testified that a white coworker, Patrice Perricone, brought her into the field for a client visit, yet VNSNY attempted to discipline the Plaintiff for Perricone's conduct and that when VNSNY realized this error, it took no such action against Perricone. While a rational juror could find that this is evidence of disparate treatment on the basis of race or color, at least for purposes of a *prima facie* case, the Court declines to find that VNSNY's failure to discipline Perricone based on this isolated incident constituted a materially adverse change in the Plaintiff's working conditions.

The Court next considers whether there is a genuine issue of material fact as to whether the Plaintiff's suspension and termination – which VNSNY concedes qualify as "adverse employment actions" – occurred under circumstances giving rise to an inference of discrimination on the basis of race, color, or national origin. The Court concludes that no such genuine issue of material fact exists.

Indeed, not only is there no direct evidence in the summary judgment record of such discrimination – for example, in the form of derogatory or offensive remarks made to anyone or that any VNSNY employee believed that the Plaintiff was being treated differently due to her race, color, or national origin – the Plaintiff has failed, in the Court's view, to come forward with sufficient circumstantial evidence of discrimination to survive summary judgment on this claim. In this regard, the Plaintiff offers no evidence that VNSNY failed to discipline "similarly

situated" non-black or non-Haitians nurses who engaged in comparable conduct. Indeed, she identifies no other nurse accused of dishonesty.

The Plaintiff's accusation that the white nurse Horrigan failed to provide proper care to the catheter patient is of little assistance to her. The accusation itself is based on inadmissible hearsay derived from an unsworn, out-of-court comment from a non-party home health aide. "It is well settled that the evidence considered in connection with a summary judgment motion must be admissible at trial." Dabney v. Christmas Tree Shops, 958 F. Supp. 2d 439, 451 (S.D.N.Y. 2013) aff'd sub nom. Dabney v. Bed Bath & Beyond, No. 13-3261-CV, 2014 WL 6980929 (2d Cir. Dec. 11, 2014). However, even if the comment could be considered, the Plaintiff offers no evidence that VNSNY believed a lapse of this nature warranted any discipline, let alone termination. Nor does the Plaintiff allege that Horrigan was ever questioned about this incident or lied about it; or that he was suspected of abbreviated patient visits, or misrepresenting his whereabouts. Absent such evidence, the Plaintiff has failed to show that they were "similarly situated" in all material respects. Uribe v. Kellogg's Snacks/Keebler, Inc., No. 05 CIV. 02959 (PGG), 2009 WL 1098369, at *5 (S.D.N.Y. Apr. 22, 2009)("Ordinarily, where a plaintiff attempts to establish a prima facie case by showing that he received unwarranted discipline, he must 'show that similarly situated employees who went undisciplined engaged in comparable conduct.'")(quoting Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)).

The Court also takes note of portions of the Plaintiff's deposition wherein she expressed her belief that the VNSNY did not discriminate against her based on her national origin. This admission is illustrative of the Plaintiff's failure to present even minimal proof that her suspension and termination were driven, even in part, by discrimination. See Ponticelli v. Zurich Am. Ins. Grp., 16 F. Supp. 2d 414, 427 (S.D.N.Y. 1998)("Additionally, Ponticelli has not

demonstrated that gender was the reason Fishman terminated her. In fact, at her deposition, Ponticelli admitted that Fishman did not say or do anything that could lead her to believe that he might have fired her because she is a woman.").

The Plaintiff minimizes the import of this admission, arguing that her perceptions or subjective views are not dispositive in determining whether discrimination in violation of Title VII occurred. To the extent the Plaintiff argues that the ultimate determination of discrimination rests within the province of the factfinder, the Court agrees. However, it does not follow that the Plaintiff's perceptions are not relevant to whether a genuine issue of material fact exists on this type of claim.

Relatedly, the Plaintiff's attempt to recant this portion of her testimony by a later-filed affidavit "runs into the well-established rule in this circuit that a party may not evade summary judgment by proffering an affidavit (or declaration) that directly contradicts the affiant's prior deposition testimony." Edge Grp. WAICCS LLC v. Sapir Grp. LLC, 705 F. Supp. 2d 304, 320 (S.D.N.Y. 2010); Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 104 (2d Cir. 2010)(citing Perma Research and Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)); Bickerstaff v. Vassar Coll., 196 F.3d 435, 454–55 (2d Cir. 1999)(citing Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)).

In sum, the Court finds that the Plaintiff has failed to establish a genuine issue of material fact as to whether her suspension or termination, or any other potential "adverse employment action," occurred under circumstances giving rise to an inference of discrimination on the basis of race, color, or national origin. Having concluded that the Plaintiff failed to discharge her burden of proving a *prima facie* case of discrimination under Title VII, the Court need not address whether VNSNY has proffered legitimate, non-discriminatory reasons for any "adverse

employment action."  Accordingly, the Court grants that part of VNSNY's motion for summary judgment dismissing the Plaintiff's Title VII discrimination claim.

## C.  The Title VII Claim of Retaliation

"Retaliation claims under Title VII follow the familiar burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." Cummings-Fowler v. Suffolk Cnty. Cmty. Coll., No. 13-4509-CV, 2014 WL 7091417, at *2 (2d Cir. Dec. 16, 2014).  If the plaintiff establishes a *prima facie* case of retaliation, then a rebuttable presumption of retaliation arises and the burden shifts to the defendant to articulate a "legitimate non-retaliatory" reason for the employment decision. El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932 (2d Cir. 2010).  The burden then shifts back to the plaintiff to prove that his or her protected activity "was a but-for cause of an adverse employment action[, for example,] by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate nonretaliatory reasons for its action." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).

In order to establish a *prima facie* case, "[a] plaintiff claiming retaliation [in violation of Title VII] must prove: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action." Gordon v. N.Y.C. Board of Education, 232 F.3d 111, 113 (2d. Cir. 2000).  At the summary judgment stage the plaintiff's burden of establishing a prima facie case of employment discrimination is "*de minimis*." Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)(internal quotation marks omitted).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only

whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

In this case, the Plaintiff points to three instances of protected activity after her suspension: (1) the June 3, 2011 letter sent by her attorneys to VNSNY alleging race discrimination; (2) the August 25, 2011 charge of discrimination with the NYSDHR; and (3) the September 6, 2011 letter to Haas.

VNSNY argues that, even assuming the Plaintiff has established the first three elements of a *prima facie* claim of discrimination under Title VII, she has failed to establish the requisite causal connection between these alleged protected activities and any "adverse employment actions." The Court agrees.

Viewing the record in the light most favorable to the Plaintiff as the non-moving party, the Court notes that there is a significant intervening event – the Plaintiff's acquiescence in Kahn's misrepresentations during the October 6, 2011 Grievance meeting – that gave VNSNY grounds to terminate Plaintiff, particularly given that, as a result of those representations, VNSNY expended additional resources on further internal investigation. The Plaintiff does not dispute that she failed to correct Kahn's misrepresentations either during or immediately after the Grievance meeting, despite contacting VNSNY regarding perceived misstatements made by VNSNY representatives. The Plaintiff concedes that not until she was confronted on November 8, 2011 with documentary evidence exposing these misrepresentations did she admit that Kahn had made false statements at the prior meeting.

"[T]his intervening event dispels an inference of a causal relationship between the protected activity and Plaintiff's termination, thus defeating Plaintiff's *prima facie* case of unlawful retaliation." Rivera v. Thurston Foods, Inc., 933 F. Supp. 2d 330, 342 (D. Conn. 2013);

see also <u>Yarde v. Good Samaritan Hosp.</u>, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005)("In this Circuit, an inference of causation is defeated . . . if . . . there was an intervening causal event."). In other words, the Plaintiff's conduct during the October 6, 2011 grievance meeting, in failing to correct Kahn's false statements, was sufficient to justify her termination. Therefore, that conduct "break[s] any chain of causation" between her protected activity and her termination. <u>See</u> <u>Hahn v. Bank of Am. Inc.</u>, 2014 U.S. Dist. LEXIS 45886, at *57 (S.D.N.Y. Mar. 31, 2014).

The Court further notes that, in her deposition, the Plaintiff conceded that she did not believe that she was fired because of the June 2011 letter or the September 6, 2011 letter. For the reasons explained previously, the Plaintiff cannot now establish a genuine issue of material fact based on an affidavit that contradicts her prior deposition testimony.

The Court also notes that it is undisputed that the VNSNY employees investigating the allegations in the Plaintiff's September 6, 2011 Letter played no role in the decision to terminate Plaintiff's employment.

In sum, the Court finds that the Plaintiff has failed to establish a genuine issue of material fact as to whether any other potential "adverse employment action" occurred in retaliation for filing any of her complaints of discrimination. Having concluded that the Plaintiff failed to discharge her burden of proving a *prima facie* case of retaliation under Title VII, the Court need not address whether VNSNY has proffered legitimate, non-discriminatory reasons for any "adverse employment action." Accordingly, the Court grants that part of VNSNY's motion for summary judgment dismissing the Plaintiff's Title VII retaliation claim.

## III. CONCLUSION

For the foregoing reasons, VNSNY's motion for summary judgment is granted; the

amended complaint is dismissed; and the Clerk of the Court is respectfully directed to close the

case.

**SO ORDERED.**
Dated: Central Islip, New York
January 2, 2015

*Arthur D. Spatt* _
                                 ARTHUR D. SPATT
                                 United States District Judge